1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THERESA BROOKE,** | **CASE NO. 1:20-CV-0103 AWI SAB** |
| **Plaintiff** | |
| v. | **ORDER ON MOTIONS FOR SANCTIONS, MOTION TO DISMISS, MOTION FOR PARTIAL SUMMARY JUDGMENT, RULE 56(d) MOTION FOR RELIEF, AND MOTION TO AMEND** |
| **SUPERB HOSPITALITY, LLC, d/b/a Fairfield Inn & Suites Selma/Kingsburg,** | |
| **Defendants** | |
| | (Doc. Nos. 44, 53, 54, 64) |

This unusually contentious matter is brought by Plaintiff Theresa Brooke against Defendant Superb Hospitality, LLC d/b/a Fairfield Inn & Suites Selma/Kingsburg ("Superb"). The operative complaint is the First Amended Complaint ("FAC"), which seeks relief under Title II of the Americans with Disabilities Act (42 U.S.C. § 12181 et seq.) ("ADA") and California Civil Code §§ 51, 52 ("Unruh Act"). Currently before the Court are three motions for sanctions (two under Rule 11 and one pursuant to 28 U.S.C. § 1927), a combined Rule 12(b)(1), Rule 12(b)(6), and alternative Rule 56 partial summary judgment motion, a Rule 56(d) motion, and a motion to amend. Briefing on all motions have now been received. This motion disposes of the non-sanctions motions.

## **FACTUAL BACKGROUND**

From the FAC, Brooke resides in Arizona but also has an office for purposes of ADA testing in California. At all relevant times, Brooke has been legally disabled and confined to a wheel chair due to a loss of a leg. Because Brooke ambulates by use of a wheelchair, she can only

1   rent a mobility accessible hotel room.  Brooke and her husband are avid travelers to California.

2   Brooke travels to California for leisure, to participate in judicial proceedings, and to conduct site

3   inspections to determine if various hotels comply with disability access laws and settlements.

4   Brooke is an ADA serial tester who intends to check Superb for compliance in the near future.

5        At an unknown time, Brooke visited Superb's website to rent rooms and check compliance

6   with disability access rules.  Brooke wanted to rent a one-bedroom suite, which is the sole suite

7   offered at Superb's hotel ("the Hotel") and offers more living space, better views, and more

8   luxurious amenities than Superb's standard rooms.  The sole accessible rooms offered at the Hotel

9   are standard rooms, which are not comparable to the suites offered at the Hotel.  In other words,

10  Superb does not provide the same room-type choices to disabled Americans as it does for able-

11  bodied persons.  Section 224.5 of the 2010 Standards of Accessible Design ("SAD") requires that

12  hotels "shall provide choices of guest rooms, number of beds, and other amenities comparable to

13  the choices provided to other guests."  Had Superb provided comparable choices as those offered

14  to able-bodied persons, Brooke would have booked a room.  However, because Brooke knew that

15  she could not obtain a suite, she was deterred from visiting Superb and will not visit the Hotel

16  until it makes a suite accessible.

17       Brooke alleges that prior to filing this lawsuit, she took a screenshots of "Superb's

18  website."  The webpage for the One Bedroom Suit indicates that it has no accessible features.

19  Further, "Superb's website" indicated that the Hotel had six room-types available, only one of

20  which was a suite.  However, during the pendency of this case, Defendant "hid" the One Bedroom

21  Suite from the "Rooms" tab of the website, reduced the number of room-types available from six

22  to five, and changed the names of the room types.  Moreover, despite removing the One Bedroom

23  Suite from the "Rooms" tab, elsewhere on the website the Hotel is described as having 3 floors, 64

24  rooms, and 22 suites.  Brooke alleges that using the Wayback Machine and other IT methods

25  demonstrates that "Superb's website" was altered.  According to the Wayback Machine,

26  Defendant used to have six room-types, including the One Bedroom Suite.[1]

27

28  _____
    [1] Brooke has included screenshots from what is alleged to be Superb's then existing website and screenshots from the
    Wayback Machine.  See FAC at pp. 5-8.

1    Finally, Brooke alleges that other barriers exist at the Hotel.  For example, the Hotel does

2    not have an access aisle at the lobby loading zone.  However, Brook alleges that she will bring that

3    action when she has an opportunity to inspect the premises.

4

5    **I.      DEFENDANT'S RULE 12(b)(1) MOTION[2]**

6         *Defendant's Arguments*

7         Superb argues *inter alia* that, per declarations filed in February, April , and May 2020, this

8    case is moot.  Declarations from the general manager of the Hotel and a Vice President of Superb

9    confirm that a One Bedroom Suite is no longer offered or available at the Hotel to anyone.  The

10   Hotel only had a single One Bedroom Suite on the property (Room 335), but that room was

11   modified as of February 17, 2020, through the removal of a door so that it is now a King Studio

12   room.  The only difference between a One Bedroom Suite and an Accessible King Studio room is

13   a door and partial wall between the bedroom and living area.  An Accessible King Studio room

14   has been available at the hotel since 2012.  The Accessible King Studio is larger than the One

15   Bedroom Suite, has all of the same features and amenities, and has a comparable view (as it is

16   located just seven doors down from Room 335).  There are also two other premium rooms that are

17   accessible, an Accessible Queen Studio and an Accessible Spa King.  Thus, contrary to the

18   allegations, there are and were comparable rooms to the One Bedroom Suite that were available to

19   Brooke, which complies with SAD § 224.5.  With the elimination of the One Bedroom Suite

20   through a physical alteration, the absence of an actual violation of the SAD, and given the ease

21   with which Brooke could check whether a One Bedroom Suite will be offered for rent through a

22   computer or smart phone search and a resulting screen shot, there is no reasonable likelihood that

23   the Room 335 King Studio will be altered and once again be offered as an inaccessible One

24   Bedroom Suite.  Finally, Superb argues that its sworn declarations demonstrate that it does not

25   own or control any websites.  All information found on the websites cited are from third parties.

26

27   [2] Superb contends that the Court lacks subject matter jurisdiction for several reasons.  Because the Court finds that Superb's arguments regarding mootness of the ADA claim and the absence of standing regarding the Unruh Claim are

28   dispositive, the Court limits its discussion and analyses to those issues.

*Plaintiff's Opposition*

Brooke argues, *inter alia*, that at this stage of the litigation, it is inappropriate to consider or address extrinsic evidence for the purpose of ruling on the pending motions.  With respect to whether Superb still has One Bedroom Suites, that is a statutory standing requirement that is intertwined with the merits of the case.  In such a situation, *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) dictates that a Rule 12(b)(6) analysis must be made instead of a Rule 12(b)(1) analysis.  Under Rule 12(b)(6), consideration of extrinsic evidence is inappropriate.

Brooke also argues that Superb's motion focuses on the alleged remediation of one suite.  However, "Superb's website" lists 22 suites at the Hotel, and the FAC alleges that there are a total of 22 inaccessible suites.  The motion does not address any actions towards the remaining 21 suites.

Finally, Brooke argues that Superb fails to meet its heavy burden of demonstrating mootness through voluntary cessation.  Superb offers no proof that its "unbelievable" changes to the One Bedroom Suite is permanent.  There is no proof that the inaccessible room will not be renamed after litigation is over or that Superb will not change the website to again advertise a One Bedroom Suite.  There is also no physical proof that shows the change to the Suite.  There is also no proof that the website, which previously listed 22 inaccessible suites but is now claimed to be a mistake, cannot be easily changed back after this case is over.  Further, it should be noted that alleged sole suite was converted on February 18, 2020, which is the same date that the Clerk made an entry of default and the same date that Superb filed its motion to dismiss.  Therefore, Defendant has not met its burden.

*Relevant Declarations*

1.   Ritu Portugal

Portugal is a Vice President of Superb.  See Doc. No. 8-16 at ¶ 2.  In relevant part, Portugal declares:  (1) the Hotel was built in 2010; (2) Superb does not own, lease, or control any website; (3) Superb does not have a website or similar internet presence whereby one could learn about the Hotel or book a room; (3) Superb has no right to change any website or internet presence through which the public could learn about the Hotel or rent rooms; (4) as a Fairfield Inn location,

rooms at the Hotel may be rented through the franchisor's website; (5) Superb is limited to asking the owners or operators of travel websites and the franchisor's website to make changes; (6) requested changes must be approved by the franchisor; (7) the allegation that the sole accessible rooms at the Hotel are standard rooms is untrue as there are Accessible King Studio, Accessible Queen Studio, and Accessible King Spa rooms available for rent; (8) compared to the One Bedroom Suite, the Accessible King Studio is seven square feet larger, has substantially the same views (being only 7 doors apart) and amenities, and does not have a full wall between the bedroom and sitting area in order to provide greater clearance and accessibility; (9) an Accessible King Studio has been available since 2010; (10) with the removal of the door, the One Bedroom Suite (Room 335) will be offered as a King Studio because it materially meets the requirements of that room type and no longer meets the requirements of a One Bedroom Suite; (11) the sole One Bedroom Suite in the hotel was Room 335; (12) because Room 335 has now been converted to a King Studio, Superb will not rent Room 335, or any other room, as a One Bedroom Suite or any similar designation; and (13) the one exception might be if a Certified Access Specialist confirms that an accessible room of a type which is presently not offered for rental meets all applicable accessibility requirements, Superb might consider offering rooms of that type to the public, but presently has no plans to do so.  See Doc. No. 8-16.

      2.      Abel Perez a.k.a. Avel Fuentez

      Perez is the general manager of the Hotel.  See Doc. No. 8-7 at ¶ 2.  In relevant part, Perez declares that:  (1) the allegation that the sole accessible rooms offered are standard rooms is false, as there are Accessible King Studio, Accessible Queen Studio, and Accessible King Spa rooms available for rent; (2) compared to the One Bedroom Suite, the Accessible King Studio is seven square feet larger, has substantially the same views (being only 7 doors apart), and does not have a full wall between the bedroom and sitting area in order to provide greater clearance and accessibility; (3) with the removal of the door, the One Bedroom Suite (Room 335) is now required to be and will be offered as a King Studio because it no longer meets the requirements of a One Bedroom Suite and most closely meets the requirements of a King Studio; (4) because the sole One Bedroom Suite (Room 335) no longer meets the requirements to be offered as a One

Bedroom Suite, there is no longer any One Bedroom Suites available at the Hotel, regardless of disability; and (5) the amenities/features of the One Bedroom Suite and the Accessible King Studio are materially the same.  See id. at ¶¶ 3-7.

        **3.**      First Supplemental Declaration of Ritu Portugal[3]

        In a supplemental declaration dated April 27, 2020, Portugal declares in relevant part:  (1) the original construction on the Hotel was completed in May 2010; (2) Superb still does not own, lease, or control any websites; (3) the screenshots depicted in the FAC appear to come from the website "Marriott.com"; (4) Superb does not own, lease, control, or have the right to change any portion of the "Marriott.com" website; (5) Superb can only request that Marriott make any desired changes, which may or may not be approved or implemented; (6) the One Bedroom Suite was converted to a King Studio on February 17, 2020 by removing a door and still does not exist; (7) other premium accessible rooms are available to rent;, including the Accessible King Studio which is larger than Room 335 and has the same amenities; (8) Superb does not represent that it has or had 22 suites available for rent; (9) it is unknown why the Marriott.com website would represent that the hotel has or ever had 22 suites; (10) through inquiry, it appears that there may have been a change in nomenclature by Marriott whereby some or all rooms that were referred to as "suites" would thereafter be called "studios"; (11) for years preceding this lawsuit, the Hotel had 21 studios and 1 suite; (12) since February 17, 2020, because the sole One Bedroom Suite was permanently converted to a King Studio, there are now a total of 22 studios for rent at the Hotel; (13) Superb is not "hiding" any suites; and (14) using the Wayback Machine technologies, in 2016 and 2017 six types of rooms were offered, but the only suite was the One Bedroom Suite.  See Doc. No. 35-3.

        **4.**      Second Supplemental Declaration of Ritu Portugal

        In a second supplemental declaration dated May 22, 2020, Portugal declared in relevant part:  (1) original construction of the Hotel was completed in May 2010; (2) Superb does not own

---

[3] The Court notes that Portugal's two Supplemental Declarations contain legal opinions and discussions, for example regarding Fed. R. Civ. P. 11 and sanctions thereunder.  Portugal's assessments, opinions, or analyses regarding Rule 11, or any other legal matters are improper.  Portugal is a fact witness.  Portugal's legal arguments should be reflected only in Superb's briefing and signed by Superb's attorney.  The Court in no way credits or considers Portugal's unnecessary and improper legal conclusions, arguments, opinions, and analyses.

or control any website which provides information about the Hotel or a means of reserving a room; (3) there has never been more the one suite at the Hotel (Room 335); (4) the sole suite at the Hotel was converted to a King Studio on February 17, 2020, by removing the door between the bedroom and living area; (5) the removal of the door requires that Room 335 now be offered and rented as King Studio consistent with the room descriptions at the Hotel and the Marriott system; (6) Superb was concerned that the representation on the Marriott.com website that the Hotel had "22 suites" was not accurate; (7) a representation that the Hotel had "22 studios" would be accurate; (8) because of concern about accuracy, Superb through counsel forwarded the FAC to Marriott and requested that Marriott correct the Marriott.com website; (9) Superb cannot change representations on the Marriott.com website; (10) Marriott.com currently does not allow a representation that there are "22 studios" instead of "22 suites"; (11) on May 16, 2020, Marriott changed the representation on Marriott.com to no longer reflect that the hotel has "22 suites," but instead now shows that there are 86 guestrooms with no representations regarding suites; (12) Room 335 was converted to a King Studio from a One Bedroom Suite because there was so little difference between the rooms that there was little benefit to having the suite, but instead there is the potential for confusion among the room categories; (13) while some hotels may use the term "suite" to identify rooms that are superior to standard rooms or "studios," that is not the case with the Hotel; (14) the same amenities available in the room category One Bedroom Suite are available in the Accessible King Studio, irrespective of the designation of the room as a "suite" or a "studio"; and (15) if Brooke had called or contacted the Hotel, she would have learned that there were room options and other efforts that could have been made to accommodate her room needs. See Doc. No. 40-1.

### *Legal Standards*

Federal Rule of Civil Procedure 12(b)(1) allows for a motion to dismiss based on lack of subject matter jurisdiction. See Fed. R. Civ. Pro. 12(b)(1).  It is a fundamental precept that federal courts are courts of limited jurisdiction. Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 374 (1978); K2 Am. Corp. v. Roland Oil & Gas, 653 F.3d 1024, 1027 (9th Cir. 2011).  Limits upon federal jurisdiction must not be disregarded or evaded.  Owen Equip., 437 U.S. at 374; Jones v.

1  <u>Giles</u>, 741 F.2d 245, 248 (9th Cir. 1984).  "It is presumed that a cause lies outside this limited

2  jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction."

3  <u>Kokkonen v. Guardian Life Ins. Co.</u>, 511 U.S. 375, 377 (1994); <u>K2 Am.</u>, 653 F.3d at 1027.  Rule

4  12(b)(1) motions may be either facial, where the inquiry is confined to the allegations in the

5  complaint, or factual, where the court is permitted to look beyond the complaint to extrinsic

6  evidence.  <u>See</u> <u>Leite v. Crane Co.</u>, 749 F.3d 1117, 1121 (9th Cir. 2014); <u>Safe Air For Everyone v.</u>

7  <u>Meyer</u>, 373 F.3d 1035, 1039 (9th Cir. 2004).  When a defendant makes a factual challenge "by

8  presenting affidavits or other evidence properly brought before the court, the party opposing the

9  motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing

10  subject matter jurisdiction."  <u>Meyer</u>, 373 F.3d at 1039; <u>see</u> <u>Leite</u>, 749 F.3d at 1121.  The court

11  need not presume the truthfulness of the plaintiff's allegations under a factual attack.  <u>Wood v. City</u>

12  <u>of San Diego</u>, 678 F.3d 1075, 1083 n.2 (9th Cir. 2011).

13      Mootness is a jurisdictional issue.  <u>Foster v. Carson</u>, 347 F.3d 742, 745 (9th Cir. 2003);

14  <u>White v. Lee</u>, 227 F.3d 1214, 1242 (9th Cir. 2000).  Because it pertains to a court's subject matter

15  jurisdiction, mootness is to be raised through a Rule 12(b)(1) motion to dismiss.  <u>White</u>, 227 F.3d

16  at 1242.  "[A] case is moot when the issues are no longer 'live' or the parties lack a legally

17  cognizable interest in the outcome."  <u>Powell v. McCormack</u>, 395 U.S. 486, 496 (1969); <u>Pitts v.</u>

18  <u>Terrible Herbst, Inc.</u>, 653 F.3d 1081, 1086 (9th Cir. 2011).  That is, if events subsequent to the

19  filing of the case resolve the parties' dispute, the court must dismiss the case as moot.  <u>Pitts</u>, 653

20  F.3d at 1087.  "The basic question in determining mootness is whether there is a present

21  controversy as to which effective relief can be granted."  <u>Bayer v. Neiman Marcus Grp.</u>, 861 F.3d

22  853, 862 (9th Cir. 2017). Therefore, if "there is no longer a possibility that [a plaintiff] can obtain

23  relief for his claim, that claim is moot and must be dismissed for lack of subject matter

24  jurisdiction."  <u>Foster</u>, 347 F.3d at 745.  "Because a private plaintiff can sue only for injunctive

25  relief (i.e., for removal of the barrier) under the ADA, a defendant's voluntary removal of alleged

26  barriers prior to trial can have the effect of mooting a plaintiff's ADA claim."  <u>Oliver v. Ralphs</u>

27  <u>Grocery Co.</u>, 654 F.3d 903, 905 (9th Cir. 2011).  However, the mere voluntary cessation of illegal

28  activity in response to pending litigation does not moot a case, unless the party alleging mootness

meets a "heavy burden" and shows that the "allegedly wrongful behavior could not reasonably be expected to recur." Friends of the Earth, Inv. v. Laidlaw Entl. Servs. (TOC), Inc., 528 U.S. 167, 189 (2000); Southcentral Found. v. Alaska Native Tribal Health Consortium, 983 F.3d at 411, 418-19 (9th Cir. 2020).

*Discussion*

1.      ADA Claim

        a.      Extrinsic Evidence

        As noted above, in a factual attack under Rule 12(b)(1), the Court is entitled to consider extrinsic evidence. Leite, 749 F.3d at 1121; Meyer, 373 F.3d at 1039. Indeed, consideration of extrinsic evidence (i.e. evidence beyond the mere allegations in the complaint) is the defining distinction between a "facial attack" and a "factual attack" on subject matter jurisdiction. See Salter v. Quality Carriers, Inc., 974 F.3d 959, 964 (9th Cir. 2020). Therefore, nothing about the procedural posture of this case prevents the Court from considering the declarations of Superb's Vice President (Portugal) and the Hotel's general manager (Perez).

        Brooke is correct, however, that the Ninth Circuit has warned against jurisdictional dismissals in cases involving federal question jurisdiction. See Safe Air, 373 F.3d at 1039. Brooke relies on the analysis of *Safe Air* at page 1039. In relevant part, *Safe Air* explained:

> However, "jurisdictional dismissals in cases premised on federal-question jurisdiction are exceptional, and must satisfy the requirements specified in *Bell v. Hood*, 327 U.S. 678, 90 L. Ed. 939, 66 S. Ct. 773 (1946)." Sun Valley Gas., Inc. v. Ernst Enters., 711 F.2d 138, 140 (9th Cir. 1983). In *Bell*, the Supreme Court determined that jurisdictional dismissals are warranted "where the alleged claim under the constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining federal jurisdiction or where such claim is wholly insubstantial and frivolous." 327 U.S. at 682-83.
>
> We have held that a "jurisdictional finding of genuinely disputed facts is inappropriate when 'the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits' of an action." Sun Valley, 711 F.2d at 139 (quoting Augustine v. United States, 704 F.2d 1074, 1077 (9th Cir. 1983)). The question of jurisdiction and the merits of an action are intertwined where "a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiff's substantive claim for relief." Id. See also Thornhill Publ'g Co. v. Gen. Tel. Co., 594 F.2d 730, 734 (9th Cir. 1979) ("When a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiffs' substantive claim for relief, a motion to dismiss for lack of subject matter jurisdiction rather than for failure to state a claim is proper only when the

allegations of the complaint are frivolous.") (quotation omitted).
Id. 1039-40.

The Court does not find that this aspect of *Safe Air* controls.  To be sure, there are several facets to Superb's Rule 12(b)(1) motion.  Critically, one of those facets, and the one that the Court is focusing on, is mootness.  *Safe Air* did not involve a mootness challenge.  The Ninth Circuit has expressly held that Rule 12(b)(1), not Rule 12(b)(6), is the proper procedural mechanism for raising a mootness challenge.  White, 227 F.3d at 1242.  The basis for mootness in this case is that the sole "barrier" that forms the basis of the FAC's ADA claim has been removed and is no longer present at the Hotel.  Superb backs that assertion through the declarations of Portugal and Perez.  As part of the mootness challenge, Superb is not arguing that Brooke's ADA claim is "made solely for the purpose of obtaining federal jurisdiction" or that the claim is "wholly insubstantial and frivolous."  Bell, 327 U.S. at 682-83; Safe Air, 373 F.3d at 1039.  Therefore, the Court cannot find that *Safe Air* requires the Court to either utilize a Rule 12(b)(6) analysis or disregard the declarations of Portugal and Perez.  Instead, because mootness is being raised, the Court will analyze mootness through Rule 12(b)(1) as a factual challenge and will consider the declarations of Portugal and Perez.  See Leite, 749 F.3d at 1121; White, 227 F.3d at 1242.

b.    Existence of a Barrier

The first cause of action alleges that Superb discriminated against Brooke by not providing her with an equal choice among the room types at the Hotel in violation of the ADA and SAD 224.5.  See FAC ¶ 39.  The factual allegations that support this cause of action are that a One Bedroom Suite is the sole type of suite offered at the Hotel, the One Bedroom Suites at the Hotel are not accessible, and the sole accessible rooms are standard rooms, which are not comparable in terms of living space, views, and luxurious amenities to the One Bedroom Suites.  See FAC ¶ 13.  Brooke's allegations regarding One Bedroom Suits and rooms offered at the Hotel are based on "Defendant's website."  See id.  The FAC also alleges that "Defendant's website" indicates that there are 22 suites available at the Hotel, none of which are accessible.  See id. at ¶ 33.  The screenshots of "Defendant's website" indicate that the website is "marriott.com."  See FAC at pp. 7-8.  From these allegations, the Court concludes that the basis of the first cause of action can be

1   summarized as follows:  only standard rooms are accessible, the hotel offers 22 suites in the form

2   of a One Bedroom Suite room type, Brooke wants the more luxurious suite to rent, but none of the

3   22 One Bedroom Suites are accessible.  After considering the allegations, briefing, and extrinsic

4   declarations, the Court agrees with Superb that this barrier does not exist.

5          The sworn declarations of Perez and Portugal demonstrate that, despite the name "Fairfield

6   Inn & Suites," the Hotel has only ever had a single room to rent as a "suite."  That room was

7   Room 335 and it was a "One Bedroom Suite" room type.  On February 17, 2020, Room 335/the

8   One Bedroom Suite was converted to a Studio King.  By removing a door, Room 335/the One

9   Bedroom Suite no longer qualifies as a "One Bedroom Suite" room type under the Marriott

10  designation system.  Therefore, as of February 17, 2020, the Hotel no longer has any One

11  Bedroom Suites available to rent.  Additionally, prior to February 17, 2020, the Hotel had 21 other

12  "premium"/non-standard guest rooms known as "Studios."  There is nothing that indicates that

13  studio room types lacked any of the premium features or amenities of the One Bedroom Suite

14  room type.  Each of the Hotel's three studio room types (Queen, King, and Spa King) have

15  accessible rooms.  Because the FAC acknowledges that the Hotel offers accessible versions of the

16  two standard guestrooms (Queen and King), the five room types (the two standard types and three

17  premium types/studios) currently existing at the Hotel each have an accessible configuration that

18  is available to rent.  That is, contrary to the FAC, there is not a room type offered to rent at the

19  Hotel that is "inaccessible."

20         Brooke's opposition and the FAC rely on allegations of chicanery and information

21  contained in screenshots of "Defendant's website."  That is, Brooke and the FAC is relying

22  entirely on representations about the Hotel that Brooke found on the Marriott.com website,

23  through either the website itself or the Wayback Machine.  There are no allegations (or responding

24  declarations or evidence) that suggest that Brooke has a different source of information.  Superb

25  has submitted no less than three sworn declarations that Superb does not own, lease, or control any

26  websites, let alone websites or some kind of internet presence whereby a person could book a

27  room or learn about the Hotel.  Superb acknowledges that one can learn information about, and

28  book rooms at, the Hotel through Marriott.com.  However, Portugal's declarations explain that this

1   is to be expected because Marriott.com is the website of the Hotel's franchisor.[4]  As the

2   franchisor's website, Superb cannot unilaterally make any changes to Marriott.com.  Instead,

3   Superb must request that Marriott.com make a change, the ultimate decision being left with the

4   franchisor Marriott.  Further, the website is called "Marriott.com," it is not called "Superb.com" or

5   anything of the like.  Going to Marriott.com allows a person to book rooms or access information

6   about hotels that fall under the Marriott umbrella or franchise system, be they located within

7   Fresno, County, a State within the United States, or cities located in foreign countries.  See

8   www.marriott.com.  There is no doubt that Marriott is a large and successful hotel

9   chain/organization with owned or affiliated hotels worldwide.  The nature of the Marriott.com

10  website plainly shows that Superb does not own the website.[5]  Therefore, the declarations of

11  Portugal and the nature of the Marriott.com website itself show that Superb neither owned nor

12  controlled that website.

13       Additionally, reliance on the representation on Marriott.com about the number of rooms at

14  the Hotel is not persuasive.  Even after the One Bedroom Suite room type was removed from the

15  available rooms at the Hotel from the Marriott.com website, screenshots from the website still

16  indicated that 22 suites were available.  Since Marriott controlled the Marriott.com website, and

17  there is no indication that Superb could control the contents of the website, Marriott was

18  apparently comfortable that the five room types listed above composed the 64 guest rooms and 22

19  suites available.  This is consistent with the second supplemental declaration of Portugal that

20  Marriott.com/Marriott considered the studios and suites to be interchangeable in terms of

21  describing the property.  Further, by listing two types of "guest rooms" and three types of

22  "studios," including one with a whirlpool, the Marriott.com website would naturally seem to

23  suggest that there is a distinction between a studio and a guest room.  This is confirmed by the

24  declarations of Perez and Portugal which indicate that the amenities between suites and studios

25  _____

26  [4] "Under the Marriott brand, there are hotels that are owned and managed by the Marriott; hotels that are managed, but not owned, by the Marriott; and hotels that are neither managed nor owned by the Marriott, but retain a franchise license to use the Marriott name."  DiFederico v. Marriott Int'l, Inc., 677 F. App'x 830, 831-32 (4th Cir. 2017).

27  [5] This is also confirmed by at least one case in which Marriott acknowledged ownership of Marriott.com through

28  requests for judicial notice of contents on Marriott.com.  Love v. Marriott Hotel Servs., 2021 U.S. Dist. LEXIS 41081, *6 (N.D. Cal. Mar. 3, 2021).

were essentially identical and that the Accessible King Studio was larger than the One Bedroom Suite.  Brooke has cited no evidence or presented any other screenshots that indicate that the amenities of a One Bedroom Suite and the Studios were materially different.  Indeed, there is no explanation by Brooke for her assertion that the only accessible rooms available at the Hotel were standard/non-premium rooms which did not have similar amenities to the suite.

In sum, Brooke's complaint and opposition are based largely on the assumption that Marriott.com is Superb's website, as well as her assumption that the website's representation that the Hotel has "22 suites" means 22 One Bedroom Suites.  The declarations of Perez and Portugal demonstrate Brooke's assumptions are incorrect.  There is no indication that Brooke ever called the Hotel directly or obtained any further information, apart from looking at Marriott.com.  If she had done so, the declarations of Perez and Portugal indicate that the Hotel would have informed her that there was only one suite in the Hotel, but that other premium/non-standard rooms were available.  That is, although it would have been confirmed that the single One Bedroom Suite at the Hotel was inaccessible, her assumption that only "standard guest rooms"/"non-premium rooms" were accessible, and that 22 One Bedroom Suites were part of the Hotel would have been shown to be incorrect.  The past representations found on the third-party Marriott.com website do not sufficiently undercut the declarations of Perez or Portugal, which show that every room type currently available at the Hotel (including three premium/non-standard rooms types) are available in accessible configurations.  Therefore, because all room types currently available at the Hotel are available in accessible configurations, the barrier identified in the FAC that forms the basis of Brooke's ADA claim is not present.

### c.   Voluntary Cessation

"[A] defendant's voluntary removal of alleged barriers prior to trial can have the effect of mooting a plaintiff's ADA claim."  Oliver, 654 F.3d at 905.  A number of considerations in this case convince the Court that Superb's voluntary actions have mooted this matter.

First, Superb made a structural change to convert the sole One Bedroom Suite to a King Studio.  Contrary to Brooke's opposition, Superb did submit a photos that demonstrate that the door was indeed removed from Room 335.  See Doc. No. 8-7 at ¶ 5; Doc. No. 35-2.  While it does

not appear that the structural change was particularly extensive, i.e. removing a door, the changes were nonetheless physical.  This is not the same as merely changing or enforcing a written policy, and additional physical alterations would have to be made to revert Room 335 back to a One Bedroom Suite.

Second, there are sworn declarations that Room 335 will only be offered as a King Studio. The one caveat being that if a decision is made to revert Room 335 to a One Bedroom Studio, then a Certified Access Specialist must first certify that the Suite is accessible.  However, there are no plans to do so.

Third, Superb appears to have twice contacted Marriott or Marriott.com regarding the representations on Marriott.com about the term "suites" and the listing of a One Bedroom Suite at the Hotel.  In each instance, Superb requested that changes be made so that there would be no indication of an available suite would be listed for the Hotel.  In other words, Superb engaged in affirmative conduct with a third party to remedy what appears to be the moving force behind this litigation.  Those efforts were successful in that Marriott.com made changes.

Fourth, the Court agrees that it could be easily determined whether Superb was re-offering the inaccessible Room 335 as the Hotel's sole One Bedroom Suite.  A telephone call to the Hotel could determine whether the Hotel was offering any One Bedroom Suites, and if so, if any were accessible.  Further, because Superb has demonstrated that Marriott.com will make a requested change if approved by Marriott, and because Marriott.com currently does not indicate that the Hotel has any suites available to book, a reappearance of the One Bedroom Suite at the Hotel on Marriott.com would reasonably support the inference that Superb requested and Marriott approved the reappearance/reoffering of the One Bedroom Suite.

Fifth, there appears to be no utility or benefit to Superb from reverting Room 335 back to a One Bedroom Suite.  Since its construction in May 2010, there has only ever been a single One Bedroom Suite at the Hotel.  If there were a significant demand for One Bedroom Suites, as opposed to Studios, it seems highly probable that Superb would have attempted to meet that demand by offering the public more than a single suite.  Moreover, there appears to be little distinction between a One Bedroom Suite and a King Studio.  The conversion of Room 335 was

accomplished through the removal of a door in the One Bedroom Suite.  No additional amenities were added, walls were not added or torn down, and no additional square feet appears to have been needed.  Based on the removal of the One Bedroom Suite room type at the Hotel on Marriott.com, it appears that Marriot/Marriott.com was satisfied that Room 335 could be considered a King Studio after the door was removed.

Sixth, there is no evidence that the Hotel offers only "standard rooms" in accessible configurations, nor is there evidence that the single One Bedroom Suite was the only "premium" room available.  As indicated above, the evidence demonstrates that five room types are offered at the hotel, two standard guest rooms and three studios.  Reverting Room 335 back to a One Bedroom Studio could expose Superb to litigation that is similar to this case.

Seventh, SAD 224.5 does not require every type of room at a hotel be offered in an accessible configuration.  See Brooke v. Sunstone Von Karman, LLC, 2020 U.S. Dist. LEXIS 196917, *6 (C.D. Cal. Aug. 25, 2020).  As quoted in the FAC, SAD 224.5 requires that hotels provide "choices of guest rooms, number of beds, and other amenities *comparable* to the choices provided to other guests."  Here, the declarations of Perez and Portugal indicate that the studio rooms are directly comparable to the One Bedroom Suite in terms of size and amenities.[6]  In particular, the declarations of Perez and Portugal indicate that the Accessible King is larger than Room 335, has similar views to Room 335, and has the same amenities as Room 335.  Thus, the evidence strongly suggests that there is no violation of SAD 224.5 simply because the single One Bedroom Suite at the Hotel was inaccessible.

Finally, Brooke's arguments regarding the significance of February 18, 2020 are misplaced.  While there was significant activity on the docket of this case on February 18, the declarations of Perez and Portugal show that Room 335 was converted on February17, 2020, and not February 18, 2020.

Collectively, the Court is satisfied that these considerations are sufficient to show that the "allegedly wrongful behavior could not reasonably be expected to recur."  Friends of the Earth,

---

[6] Photos taken from Room 335 and the Accessible King Studio (which is seven doors down from Room 335) indicate that the views from the windows are similar.  See Perez Dec. Exs. 8, 9.

1    528 U.S. at 189.  Therefore, Superb's voluntary correction of the barrier alleged in the FAC moots

2    this case.

3                      d.      Conclusion

4          The declarations and exhibits submitted in support of Superb's Rule 12(b)(1) factual attack

5    demonstrate that a One Bedroom Suite is no longer offered at the Hotel, it is not reasonably

6    expected that Superb would reconvert and relist the inaccessible Room 335 as the Hotel's sole

7    One Bedroom Suite, and accessible configurations of all five room types at the Hotel (including

8    three premium room types) are available for booking.  The contrary allegations in the FAC are

9    based on incorrect assumptions and interpretation of a third party website that is not owned,

10   leased, or controlled by Superb.  Therefore, Superb's Rule 12(b)(1) motion to dismiss the ADA

11   claim on the basis of mootness will be granted.

12         2.      Unruh Act Claim

13         The Unruh Act limits its scope to "[a]ll persons within the jurisdiction of [California]."

14   Cal. Civ. Code § 51(b).  Recognizing this scope, several District Courts have found Brooke's

15   allegation that she maintains an office in San Jose, California for the purpose of ADA testing to be

16   insufficient, by itself, to fit within the Unruh Act's limited scope.  See Brooke v. Inn at Jack

17   London Square LLC, 2020 U.S. Dist. LEXIS 182464, *11-*12 (N.D. Cal. Aug. 28, 2020); Brooke

18   v. IA Lodging Santa Clara LLC, 2020 U.S. Dist. LEXIS 119897, *8-*9 (N.D. Cal. July 8, 2020).

19   The reasoning of these courts is essentially that the mere allegation of a California office does not

20   demonstrate that an Arizona resident was actually discriminated against while she was in

21   California.  See Inn at Jack London Square, 2020 U.S. Dist. LEXIS 182464 at *11-*12; IA

22   Lodging, 2020 U.S. Dist. LEXIS 119897 at *8-*9; see also Brooke v. Cosumnes River Land LLC,

23   2020 U.S. Dist. LEXIS 75618, *10-*11 (E.D. Cal. Apr. 28, 2020); Brooke v. RIHH LP, 202 U.S.

24   Dist. LEXIS 27266, *11-*12 (N.D. Cal. Feb. 18, 2020).  The Court finds this to be a reasonable

25   and common sense application of the Unruh Act and its limitation to people "within the

26   jurisdiction of [California]."

27         As applied to this case, the FAC only alleges Brooke's Arizona residence and the existence

28   of her California office.  The FAC does not allege that Brooke was in her San Jose office when she

1    experienced the alleged discrimination.  Therefore, dismissal of Brooke's Unruh Act claim for

2    lack of standing is appropriate.  Inn at Jack London Square, 2020 U.S. Dist. LEXIS 182464 at

3    *11-*12; IA Lodging, 2020 U.S. Dist. LEXIS 119897 at *8-*9.

4           It is not clear that amendment would be futile in terms of Brooke's standing.[7]  However,

5    the Court has found that Brooke's ADA claim is moot.  When all federal claims have been

6    dismissed, courts have discretion to decline to exercise supplemental jurisdiction over the

7    remaining state law claims.  See 28 U.S.C. § 1367(c)(3).  The general rule is "when federal claims

8    are dismissed before trial . . . pendent state claims should also be dismissed.  Religious Tech. Ctr.

9    v. Wollersheim, 971 F.2d 364, 367-68 (9th Cir. 1992).  Considering the early procedural posture

10   of this case (a scheduling order has not yet been entered), for purposes of permitting amendment,

11   the Court will exercise its discretion and decline to exercise supplemental jurisdiction over the

12   FAC's Unruh Act claim.  Therefore, even if Brooke can correct her standing problem and allege

13   that she experienced discrimination while she was in her San Jose office, application of §

14   1367(c)(3) would nevertheless result in the ultimate dismissal of that claim in this Court.

15   Therefore, the Court will dismiss Brooke's Unruh Act claim without leave to amend.

16

17

18   **II.     Superb's Rule 56(a) Motion & Brooke's Rule 56(d) Motion**

19          The Court has found that Brooke's ADA claim is moot.  Further, a lack of adequately pled

20   standing and application of § 1367(c)(3) has led to the dismissal of Brooke's Unruh Act claim.  In

21   other words, all causes of action have been resolved.  Under these circumstances, Superb's motion

22   for summary judgment is moot and will be denied as such.  Similarly, with the denial of Superb's

23   motion for summary judgment, Brooke's Rule 56(d) motion is also moot and will be denied as

24   such.

25

26

27   [7] The Court notes that the declarations of Perez and Portugal, particularly the paragraphs that describe the amenities, size, and view of the One Bedroom Suite compared to the Accessible King Studio, suggest that amendment would be

28   futile based on the substantive merits of the claim.  However, the Court limits its holding to the issue of standing.

1    **III.**   **Motion To Amend**

2         *Plaintiff's Argument*

3         Brooke alleges that since filing this lawsuit, she recently personally encountered another

4    barrier at the Hotel.  Brooke went to the Hotel after receiving notice that 1 of the 22 One Bedroom

5    Suites had been remediated.  When Brooke went to the Hotel, the Hotel's lobby loading zone (the

6    area right outside the lobby where families park to check in) did not have a compliant access aisle

7    as is required by SAD 503.  The proposed Second Amended Complaint explains that Brooke

8    parked her car at the lobby zone, but could not access the lobby from the lobby loading zone.  The

9    Hotel did not have a striped access aisle at the lobby loading zone, and there were two vehicles

10   blocking Brooke's access to the lobby.  The vehicles were parked where the access aisle should

11   have been.  The access aisle indicates where persons should not park, thereby giving a free access

12   for a person in a wheelchair.  Because of the non-compliant lobby loading zone, Brooke was not

13   provided full and equal access to the Hotel and lobby and thus, was deterred from lodging at the

14   Hotel again.  Brooke argues that the relevant Rule 15 considerations favor amendment and

15   permitting her to pursue an ADA claim and an Unruh Act claim based on a non-conforming lobby

16   loading zone access aisle.  However, Brooke states that she anticipates that Superb will have

17   remediated the access aisle by August 2020, so she has a reservation to lodge at the Hotel in

18   August 2020.  Finally, Brooke states that if the Court declines to permit amendment, then she will

19   file a second lawsuit based on the access aisle.

20        In reply, Brooke argues that the proposed SAC contains plausible claims based on

21   violations of SAD 503.  Superb's arguments largely rely on procedural technicalities that are of

22   little consequence because the same standards govern Rule 15(a) and Rule 15(d).  Judicial

23   economy and Ninth Circuit precedent counsel in favor of granting this motion.

24        *Defendant's Opposition*

25        Superb argues *inter alia* that Brooke's motion is defective in terms of seeking an

26   amendment.  Because the proposed claims arise after the lawsuit was filed, Brooke should have

27   moved to file a supplement under Rule 15(d).  Further, the proposed amended complaint does not

28   state plausible claims regarding the access aisle.  Because the Hotel was built in May 2010, the

2010 Standards of Accessible Design, including SAD 503, do not apply to the Hotel.  The 2010 Standards apply to improvements made after March 15, 2012.  Instead, the Hotel only needs to comply with the 1991 Standards.  The relevant standard, the 1991 Americans with Disabilities Act Accessibility Guideline ("ADAAG") 4.6.6 does not require signage or marking/striping the lobby loading zone access aisle.

In a supplement, Superb states that it has now posted signs that state no parking or stopping is permitted in front of the lobby entrance and that violators will be towed.

### Legal Standard

Federal Rule of Civil Procedure 15 governs amended and supplemental pleadings.  To add claims that are based on conduct that occurred prior to the filing of a pleading, the proper procedural mechanism is an amendment through Rule 15(a).  Eid v. Alaska Airlines, Inc., 621 F.3d 858, 874 (9th Cir. 2010).  Under Rule 15(a), if a party can no longer amend a pleading as a matter of course, then the "party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Rule 15(a)(2) motions are generally granted with extreme liberality.  C.F. v. Capistrano Unified Sch. Dist., 654 F.3d 975, 985 (9th Cir. 2011).  To add claims that are based on conduct that occurred after the filing of a pleading, the proper procedural mechanism is a supplement through Rule 15(d).  Eid, 621 F.3d at 874.  In relevant part, Rule 15(d) provides that "the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. . . ."  Fed. R. Civ. P. 15(d).  Rule 15(d) is a tool of judicial economy and efficiency that enables a court to provide more complete relief without the necessity of separate actions; as long as the supplement has "some relation" to the original pleading, Rule 15(d) supplementation is a favored procedure.  Keith v. Volpe, 858 F.2d 467, 473-74 (9th Cir. 1988).  The same factors are generally considered in deciding either a Rule 15(a) or Rule 15(d) motion.  See United States ex rel. Gadbois v. PharMerica Corp., 809 F.3d 1, 7 (1st Cir. 2015); Franks v. Ross, 313 F.3d 184, 198 n.15 (4th Cir. 2002); Lyon v. ICE, 308 F.R.D..3d 203, 214 (N.D. Cal. 2015); Fresno Unified Sch. Dist. v. K.U., 980 F.Supp.2d 1160, 1175 (E.D. Cal. 2013).

1   *Discussion*

2   Procedurally, Brooke's motion is improper.  Because the basis of the additional ADA and

3   Unruh Act claims is conduct that occurred after the filing of the FAC, Brooke's motion should

4   have been brought under Rule 15(d), not Rule 15(a)(2).  Eid, 621 F.3d at 874.  However, unlike in

5   *Eid*, Brooke's reply shows that she is not insisting that her motion to amend be considered purely

6   under an inapplicable rule.  Further, because the parties address the substance of Brooke's motion,

7   and because the standards for deciding Rule 15(a)(2) and Rule 15(d) motions are generally the

8   same, the Court will not deny Brooke's motion simply because she initially invoked Rule 15(a)

9   instead of Rule 15(d).

10   Substantively, however, there is a problem with the proposed second amended complaint.

11   Brooke's reply confirms that the proposed second amended complaint is based on the 2010

12   Standard for Accessibility, specifically SAD 503.  ADA regulations clarify that "[i]f physical

13   construction or alteration commence after July 26, 1992, but prior to September 15, 2010, then

14   new construction or alterations subject to this section must comply with either UFAS or the 1991

15   Standards . . . ."  28 C.F.R. 35.151(c)(1).  The evidence before the Court is that construction of the

16   Hotel was completed in May 2010.  Because the Hotel was completed in May 2010, the 1991

17   Standards apply to the Hotel; the 2010 Standards, and in particular SAD 503, have no apparent

18   application.  See id.; Johnson v. In Suk Jun, 2020 U.S. Dist. LEXIS 207488, at *11-12 (N.D. Cal.

19   Nov. 5, 2020); see also Rutherford v. Lucatero, 2020 U.S. Dist. LEXIS 81127, *10-*11 (C.D. Cal.

20   Feb. 24, 2020) (explaining that the time of construction or alteration determines which set of

21   standards a building must meet).

22   Brooke's proposed second amended complaint does not explain the basis for concluding

23   that SAD 503 applies to the Hotel.  Similarly, Brooke's reply does not reply to several critical

24   arguments in Superb's opposition.  Brooke does not respond to Superb's assertion that the 2010

25   Standards do not apply, that the 1991 Standards do apply, and that the particular subpart of SAD

26   503 that is actually at issue (SAD 503.3.3, which requires markings to discourage cars from

27   parking in an access aisle) is not a requirement that is part of the 1991 Standards (in particular

28   1991 ADAAG 4.6.6.).  Brooke's failure to address these arguments can be considered a

1  concession of the points.  See Warnshuis v. Bausch Health U.S., LLC, 2020 U.S. Dist. LEXIS

2  10736, *6 n.1 (E.D. Cal. June 18, 2020).

3          Without more from Brooke, the Court concludes that the proposed second amended

4  complaint is attempting to find violations of the ADA and the Unruh Act based on an inapplicable

5  standard, SAD 503.  Because there is an insufficient indication that SAD 503, and in particular

6  SAD 503.3.3, has any application to Superb/the Hotel, the Court concludes that permitting

7  amendment would be futile.[8]  Futility is alone a sufficient basis to deny amendment under Rule

8  15.  See Hooper v. Shinn, 985 F.3d 594, 622 (9th Cir. 2021); Gadbois; 809 F.3d at 7.  Therefore,

9  Brooke's motion to amend will be denied.[9]

10

11          **IV.      ADMINISTRATIVE MATTERS**

12          This order ends the substantive aspects of this case.  However, because there are three

13  motions for sanctions pending, the Court will not order the closure of the case at this time.  The

14  Court will address the pending sanctions motions in separate orders.  Upon resolution of the

15  pending sanctions motions, the Court will order the closure of the case.

16          Additionally, Document No. 53 on the Court's docket is a document that re-notices

17  numerous motions by Superb.  However, Document No. 53 was filed as a multi-part motion.

18  Because the effect of Document No. 53 is to double the true number of pending motions, the Court

19  will deny Document No. 53 as a pending motion.  The denial is purely administrative and does not

20  affect the analysis of this order or the pending motions for sanctions.

21

22  [8] The Court notes that the proposed second amended complaint also included allegations regarding "Defendant's
23  website" that sought to clarify that the Marriott.com was Defendant's official website for learning about the Hotel and
    making reservations.  However, that allegation does not change the facts established in the Perez and Portugal
24  declarations that demonstrate that the Hotel only had one suite, the one suite was converted to a King Studio, all room
    types offered at the Hotel have an accessible configuration available to rent, and Superb does not own, lease, or
    control Marriott.com or the contents thereof.  In other words, the additional allegations do not change the fact that
25  Brooke's "room type" discrimination claim is moot.

26  [9] The Court notes that Brooke did not address Superb's argument or the corresponding pictures that demonstrate that
    the Hotel no longer permits any cars to park or stop in front of its lobby.  Superb's actions have arguably remedied
27  any violation of SAD 503 and would make any ADA claim premised on a violation of SAD 503 futile.  However,
    because the Court finds that Brooke has not sufficiently explained how SAD 503 applies to the Hotel, the Court need
28  not decide what affect Superb's new policy and signage actually have.  It is enough to note that there are additional
    issues that appear to undercut Brooke's motion to amend.

**ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1. Defendant's Rule 12(b)(1) motion to dismiss (Doc. No. 44) is GRANTED as follows:

   a. Plaintiff's ADA claim is DISMISSED without leave to amend as moot;

   b. Plaintiff's Unruh Act claim is DISMISSED for lack of standing and without leave to amend through application of 28 U.S.C. § 1367(c)(3);

2. Defendant's Rule 56 motion for summary judgment (Doc. No. 44) is DENIED as moot;

3. Plaintiff's motion for Rule 56(d) relief (Doc. No. 64) is DENIED as moot;

4. Plaintiff's motion to amend (Doc. No. 54) is DENIED; and

5. The "motions" at Doc. No. 53 are DENIED in their entirety as being erroneously filed as "motions."

IT IS SO ORDERED.

Dated:   March 29, 2021

_____
SENIOR  DISTRICT  JUDGE